# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**INSTITUT PASTEUR,**

**Plaintiff,**

v.

**CHIRON CORP.,**

**Defendant.**

**Civil Action No.  03-0932 (JDB)**

## <u>MEMORANDUM OPINION</u>

Plaintiff Institut Pasteur brings this action to appeal the decisions of the United States Patent and Trademark Office awarding priority of invention for a diagnostic test for HIV antibodies to defendant Chiron Corporation ("Chiron").  Chiron has filed a motion to compel arbitration and to stay this action pending the outcome of the arbitration, arguing that a 1993 cross-license agreement signed by Chiron and Institut Pasteur compels arbitration of certain issues in this action.  Institut Pasteur maintains that it signed the cross-license agreement for limited purposes only and that it is not bound to the arbitration provision in the agreement.

In a March 2004 opinion, the Court explained that it was not beyond dispute, on the record then before the Court, that there had been a meeting of the minds between Chiron and Institut Pasteur on an agreement to arbitrate.  The Court therefore held a two-day trial in September 2004 to determine whether such an agreement existed.  The Court has now carefully considered the evidence and testimony presented at the trial, the memoranda of the parties, the argument of counsel at a hearing on the issue, and the entire record in the case, and concludes

1

that, in the specific circumstances of this case, Institut Pasteur should not be able to evade an

arbitration provision contained in a contract that it knowingly signed. The Court will therefore

enter judgment in favor of Chiron on the issue of the arbitrability of the HIV Cross-License

Agreement.[1]

## BACKGROUND[2]

Institut Pasteur is a private, non-profit medical research foundation organized under the

laws of France. JTX 45, at 1; 9/7/2004 A.M. Tr. at 88:21-89:8.[3] During the period relevant here,

Institut Pasteur was a minority shareholder of Pasteur Sanofi Diagnostics ("PSD"), a company

that develops, manufactures and sells medical diagnostic products. 9/7/2004 A.M. Tr. at 91:12-

91:13.[4] Institut Pasteur and PSD were parties to a cooperation agreement under which PSD had a

right of first refusal to a license of any of Institut Pasteur's intellectual property relating to

diagnostics. JTX 1, arts. 5.1, 5.10; 9/7/2004 P.M. Tr. at 90:23-91:3, 94:7-95:1. The agreement

also allowed PSD to sub-license this property to third parties, provided that Institut Pasteur had

given its "prior agreement to the signing of the sub-license in question" and was a "signatory to

---

[1] This opinion was provided to the parties in advance of release to ensure that no confidential business information that had been submitted under seal was being released. Based on plaintiff's input, one minor adjustment to the opinion was made.

[2] This section contains the Court's findings of fact on the issue of whether there is an agreement to arbitrate.

[3] "JTX" refers to the joint trial exhibits. "PTX" and "DTX" refer to plaintiff's and defendant's trial exhibits respectively. Citations to the trial transcript contain the date of the trial, whether it was the morning or the afternoon session, and the page and line numbers of the cited testimony.

[4] The majority shareholder of PSD was a corporation named Elf Sanofi. Pl.'s Post-Trial Br. at 3. Elf Sanofi's legal department represented PSD during the negotiations of the agreements at issue in this action. 9/8/2004 A.M. Tr. at 71:18-72:24; JTX 37, 40, 51 at 10-11.

said sub-license."  JTX 1, art. 5.10; 9/7/2004 P.M. Tr. at 94:7-95:1; 9/8/2004 A.M. Tr. at 5:6-7:14, 8:17-8:23.

Pursuant to this agreement, Institut Pasteur licensed to PSD its intellectual property relating to diagnostics for the human immunodeficiency virus (HIV), and PSD in turn sub-licensed this property in certain geographic areas to one of its subsidiaries, Genetic Systems Corporation (GSC).  9/8/2004 A.M. Tr. at 11:13-11:17; 12:22-13:16.  In 1992, these companies -- Institut Pasteur, PSD, and GSC -- began exploring the possibility of a partnership with Chiron and Ortho Diagnostics Systems, Inc. ("Ortho"), two companies that working together had developed a strong portfolio of patents in hepatitic C virus (HCV) immunodiagnostics,[5] and were gaining a foothold in HIV immunodiagnostics as well.  9/7/2004 A.M. Tr. at 35:1-35:12; 9/8/2004, A.M. Tr. at 12:22-13:8.

The various entities negotiated for several months in 1993.  The negotiations culminated in a series of contracts in late 1993, three of which are relevant to the instant dispute.  The first is an HIV Cross-License Agreement, in which Institut Pasteur, PSD and GSC agreed to license to Ortho and Chiron, and Ortho and Chiron agreed to license to PSD and GSC, intellectual property relating to HIV immunodiagnostics in certain countries.  JTX 45.  The second contract is an HCV License Agreement, in which Ortho and Chiron licensed to PSD certain intellectual property relating to HCV immunodiagnostics in certain countries.  JTX 49.  Finally, the third contract is a Non-Assertion Agreement, in which Institut Pasteur agreed not to use certain of its

---

[5]  Immunodiagnostics refer to a subset of diagnostics that work "by detecting whether the immune system has mounted a response through antibodies that tells you that an infectious agent has been in a person."  9/7/2004 P.M. Tr. at 30:10-30:17.

HCV patents to challenge the HCV-related patents of Ortho and Chiron.[6]  JTX 44.

## I.    Text of the Agreements

The present dispute concerns the arbitration clause in the HIV Cross-License Agreement. The clause is located in section 9.10.2, which  provides that "[a]ny dispute, controversy, or claim arising out of or relating to the validity, construction, enforceability or performance of this Agreement shall be settled by binding Alternative Dispute Resolution" by a neutral arbitrator selected by the Center for Public Resources in New York City and applying New York law.  Id. §§ 9.10.2, 9.10.2.2.  The clause is at the center of the present dispute because Chiron maintains that certain other provisions in the HIV Cross-License Agreement foreclose Institut Pasteur from challenging the decisions in the Patent and Trademark Office, and that the interpretation of these provisions is delegated to an arbitrator under section 9.10.2.  The parties do not seem to dispute, at least before this Court, that the question of whether these provisions in fact bar this action is a "dispute" that "aris[es] out of or relat[es] to the validity, construction, enforceability or performance" of the cross-license agreement within the meaning of section 9.10.2.  The only question presently before this Court is whether Institut Pasteur is bound to the arbitration provision at all.

The parties direct the Court to several provisions in the agreement that they believe bear on this question:

First, the preface to the cross-license agreement states that it is "made by and among" Chiron, Ortho, PSD, and GSC.  The preface closes with a statement that Institut Pasteur "joins in

_____

[6]  The parties also entered into "manufacturer representative agreements" in which Ortho and Chiron agreed to sell GSC and PSD's products throughout North America.  JTX 17; PTX 16; 9/8/2004 P.M. Tr. at 12:2-12:21.

this Agreement for the purposes set forth herein."  Id. at 1.

Second, section 2.8 of the Agreement confers certain rights and obligations upon Institut

Pasteur:  (I) Ortho must attempt to obtain clarification regarding the scope of one of its

sublicenses within six months of the agreement, and "such period shall be extended with Institut

Pasteur's prior consent (which consent shall not be unreasonably withheld) once by up to six

additional months," id. § 2.8.1; (ii) Institut Pasteur grants a short-term option to Ortho and

Chiron to obtain a license for certain patents, and Ortho and Chiron must pay a royalty to Institut

Pasteur calculated by a formula set out in the agreement, id. §§ 2.8.1, 2.8.2; (iii) "Except as set

forth herein, such license from Institut Pasteur shall be subject to the same use limitations, terms

and conditions as the licenses granted hereunder to the Ortho/Chiron Parties by PSD and GSC,"

id.; and (iv) "PSD, GSC, and Institut Pasteur . . . agree not to assert (or assist others in asserting)

against the Ortho/Chiron Parties" certain patent rights, id. § 2.8.3.

Third, section 6.3 provides that "[t]he parties shall cooperate reasonably to resolve and

withdraw from any patent interferences, and withdraw from any patent oppositions, between

them with respect to Licensed Ortho/Chiron Patents owned by Ortho, Chiron, or their Affiliates

or Licensed PSD/GSC Patents owned by PSD, GSC or their Affiliates, or Institut Pasteur, to the

extent the coverage of claims involved in such interference or opposition is limited to the uses

licensed under this Agreement."  Id. § 6.3.  The section continues:  "In addition, under a separate

agreement of even date herewith, Chiron and Institut Pasteur have agreed to work expeditiously

toward the withdrawal of their oppositions and/or potential oppositions against each other's

patent rights specifically relating to HIV-1 and/or HIV-2."  Id.

Fourth, section 9.6 states:  "This Agreement is entered into solely for the benefit of the

parties hereto, and the provisions of this Agreement shall be for the sole and exclusive benefit of

such parties.  Nothing herein contained will be deemed to create any third party beneficiaries or

confer any benefit or rights on or to any person not a party hereto, and no person not a party

hereto shall be entitled to enforce any provisions hereof or exercise any rights hereunder."  Id. §

9.6.

Fifth, section 9.10.1 of the Agreement states:

> The parties recognize that bona fide disputes as to certain matters may arise from
> time to time.  In the event of the occurrence of such a dispute, either party may, by
> written notice to the other party, have such dispute referred to the respective
> officers designated below or their successors, for attempted resolution by good
> faith negotiations . . . .  The designated officers for Chiron and Ortho are their
> respective Presidents or Chairmen; the designated officers for GSC and PSD are
> their respective Presidents or Chairmen.  In the event the designated officers are
> not able to resolve the referred dispute within the 30-day period, either party may
> invoke the provisions of Section 9.10.2 within 15 days following the 30-day
> period.

JTX 45, § 9.10.1.

Sixth, section 9.15 provides that "Institut Pasteur, by executing this Agreement, hereby

signifies its consent to the terms hereof, agrees to the provisions of Section 2.8, and agrees to

take no action which would have the effect of frustrating this Agreement."  Id. § 9.15.

Seventh, there are certain provisions in the Agreement where Institut Pasteur is not

mentioned, although Ortho, Chiron, GSC, and PSD are.  See, e.g., id. § 5.1 (warranties), § 7.2

(breaches and cure), § 8.1 (confidential information), § 9.8 (indemnification).

Eighth, and finally, the Agreement concludes with the statement that "the parties have

duly executed this Agreement on the date(s) written below."  Id. at 22.  Immediately following

this language is a signature block for each of Chiron, PSD, Ortho, GSC, and Institut Pasteur.

Above Institut Pasteur's signature block is the phrase "For Approval and as to Section 2.8." Id. No language is found above any of the other signature blocks.

The Non-Assertion Agreement and the HCV License Agreement differ from the HIV Cross-License Agreement in certain ways that are relevant to this dispute. For example, the preface of the Non-Assertion Agreement indicates that it was "made by and among" Chiron, Ortho, and Institut Pasteur; the Agreement contains an arbitration provision that chooses a Zurich forum applying French law; and there is no qualifier at all above Institut Pasteur's signature block. JTX 44 at 1, 5, § 6.2. The HCV License Agreement does not list Institut Pasteur in the preface at all; it contains an alternative dispute resolution clause that specifies a New York forum applying New York law; and the words "For Approval" appear above Institut Pasteur's signature block. JTX 49 at 1, 25, § 13.10. Nonetheless, as is true of the HIV Cross-License Agreement, the HCV License Agreement contains a provision stating that Institut Pasteur, "by executing this Agreement, hereby signifies its consent to the terms hereof and agrees to take no action which would have the effect of frustrating this Agreement." Id. § 13.15.

## II.    Negotiating History

The evidence presented at trial reveals the negotiating history of these agreements to have proceeded as follows. After an initial exchange of correspondence, the companies met for the first time to discuss an accord in New York City in February 1993. Representatives from PSD, GSC, Ortho and Chiron were present at the meeting, as was Alain Gallochat, the general counsel of Institut Pasteur. In fact, Gallochat gave a presentation on Institut Pasteur's patent position and the nature of its license agreement with PSD. 9/7/2004 A.M. Tr. at 41:19-42:7; 9/7/2004 P.M. Tr. at 33:24-34:10; 9/8/2004 Tr. at 75:19-76:18. At one point in the discussions, Gallochat asked

7

representatives from Chiron if they would withdraw pending oppositions to Institut Pasteur's patents as part of any deal.  9/7/2004 A.M. Tr. at 50:21-51:4; 9/7/2004 P.M. Tr. at 34:24-36:7.

The parties spent the next several months negotiating the terms of an agreement, and then met twice in June of 1993 -- first in New York City and then the next week in Paris -- to finalize a term sheet.  9/7/2004 A.M. Tr. at 52:19-52:24.  Gallochat again participated in discussions at the Paris meeting.  9/7/2004 A.M. Tr. at 53:4-53:11.  Notes from the meeting indicate that Gallochat discussed both HIV and HCV licensing issues.  DTX 39, at 7948 ("AG:  Had wanted to present to IP Board tomorrow that we have settled all issues on HCV and HIV.").  The parties agreed on a term sheet the day after the Paris meeting, and began preparing drafts of the three agreements that were consistent with the term sheets.  9/7/2004 A.M. Tr. at 53:15-53:17, 55.

On July 20, 1993, Peter Staple, the Vice-President and Associate General Counsel of Chiron, sent the first draft of an "HIV Cross-License Agreement" to counsel at Elf Sanofi, who had been representing PSD throughout the negotiations.[7]  JTX 11.  In the cover letter accompanying the draft, Staple explained that "[l]ike the draft HCV Agreement sent to you yesterday, this draft is based on the terms set forth in the term sheet we prepared in June, and contemplates approval by Institut Pasteur."  JTX 11.  The draft contained provisions specifying that the agreement would be construed in accordance with New Jersey law and that any dispute relating to the agreement would be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association.  Id. 1653.  The agreement did not contain the language later contained in section 2.8 conferring a license from Institut Pasteur to

---

[7]  See supra note 4.  Staple had sent the first draft of an "HCV License Agreement" to counsel at Elf Sanofi on July 19, 2003, and would send the first draft of a "Non-Assertion Agreement" to counsel at Elf Sanofi and to Gallochat on July 27, 1993.  JTX 11; PTX 43.

Chiron and Ortho.  Institut Pasteur was not mentioned in the preface of the draft agreement, and only the words "For Approval" appeared above Institut Pasteur's signature block.  Id. at 1641, 1654.

Staple did not send a copy of this draft agreement to anyone at the Pasteur-related parties (Institut Pasteur, PSD, or GSC) except to counsel at Elf Sanofi (who were representing PSD). He testified that the recipients of the letter at Elf Sanofi had told him that they would provide copies to Institut Pasteur and the other interested parties throughout the negotiating process. 9/7/2004 A.M. Tr. at 56:1-56:5.  Although one of the Elf Sanofi counsel representing PSD who received this letter denied passing the drafts on to Institut Pasteur, 9/8/2004 P.M. Tr. at 32:9-32:11, there is considerable evidence in the record that Institut Pasteur in fact reviewed the HIV Cross-License Agreement as it evolved and played a role not only in the negotiation of the agreement generally, but in its arbitration and choice of law provisions specifically.

For example, in a letter dated July 23, 1993, Elf Sanofi counsel wrote to Staple with comments on the initial draft HIV Cross-License Agreement.  JTX 12.  The letter proposes several edits that appear to have originated with Institut Pasteur and Alain Gallochat (its general counsel).  For example, the letter suggests a change to one of the definitions in the agreement on behalf of Gallochat:  "[w]e propose, for the future patents, the following definition, which was provided by Alain Gallochat."  JTX 12 at 4662.  The letter elsewhere suggests that section 6.3 of the agreement was also unsatisfactory in light of the participation of Institut Pasteur in the agreement:  "This paragraph will need some adjustments because of IP."  Id. at 4664.

Most important, the letter indicates that Institut Pasteur would require changes to the arbitration and choice of law provision in the agreement:  "9.8  Because of IP, French law should

apply."  Id.  Elf Sanofi therefore proposed an alternate arbitration clause that would apply French

law and resolve any disputes by arbitration through the International Chamber of Commerce in

Paris, France.  Id.  The author of the letter, Nicole Rieunier-Burle, testified that this language in

the letter does not signify that PSD was receiving any actual input from Institut Pasteur, but

instead reflects PSD's understanding that it is easier for Institut Pasteur to "approve an agreement

that would be understandable according to the French legal standards."  9/8/2004 P.M. Tr. at

31:9-31:15.

However, other evidence confirms that PSD was in fact consulting with Institut Pasteur

on negotiations over the arbiration and choice of law clauses in the HIV Cross-License

Agreement.  When Chiron rejected the proposal of French law applied by a French arbiter, the

parties continued to negotiate this provision, including on a September 3, 1993, conference call.

DTX 51; 9/7/2004 A.M. Tr. at 59:9-59:12.  Notes taken by William Gerber, then the president of

the diagnostics division at Chiron, state:

> HIV
> . . . .
> Choice of law/Arbitration
> PSD w/ discuss [with] IP & respond by Thursday, 9 Sept.
> Possible:  Limit discovery under NY law.  Alternative dispute resolution.

DTX 51.[8]  After an additional exchange of correspondence, the parties settled on a final version

of the arbitration clause that in fact -- consistent with the notes of the conference call -- specifies

New York law and places limitations on discovery not in the initial drafts of the agreement.  JTX

---

[8] Staple testified as well that a PSD representative on this call stated that they would discuss the arbitration provision with Institut Pasteur.  9/7/2004 A.M. Tr. at 75:25-76:8.

14, 16, 45.[9]

Section 2.8 of the HIV Cross-License Agreement was added late in the negotiations.  In October of 2003, Chiron notified PSD that there was certain intellectual property that it had been expecting to receive in the HIV cross-license but that had not yet been listed in the agreement. PSD replied that the intellectual property in question was in the exclusive control of Institut Pasteur and therefore PSD had no right to license the property.  JTX 27; 9/7/2004 A.M. Tr. at 68:2-68:10; 9/8/2004 A.M. Tr. at 25:3-25:8.  PSD proposed that the parties create a new, stand-alone agreement between Institut Pasteur and Ortho/Chiron to address these two patents.  JTX 27; 9/8/2004 A.M. Tr. at 25:9-25:14; 38:16-38:22.  Ortho and Chiron rejected this proposal. 9/8/2004 A.M. Tr. at 25:9-25:14; 38:22-38:25; 9/8/2004 P.M. Tr. at 41:3-41:8.  The parties therefore took up negotiations on a new provision in the HIV Cross-License Agreement that would address this additional property.

As the parties discussed what would eventually become section 2.8, Institut Pasteur took on a greater involvement in the negotiations.  JTX 28, 33, 36.  Nevertheless, PSD and Elf Sanofi continued to serve as the principal negotiators for the Institut Pasteur parties, even with regard to section 2.8 itself.  JTX 25-27, 29-32, 34-35, 37-38, 40; DTX 76.  The parties eventually agreed on a provision in the HIV cross-license in which Institut Pasteur would give Chiron a six-month option to sub-license these patents.  JTX 32; 9/8/2004 A.M. Tr. at 25:9-25:14; 9/8/2004 A.M. Tr. at 37:16-37:24.  When this provision was added, several other changes were made to the

---

[9]  The letter and notes discussed in the text are consistent with other evidence indicating that Gallochat was kept apprised of the terms of the HIV Cross-License Agreement as it evolved. See, e.g., JTX 18 (letter later in the negotiations from Gallochat indicating that he knew about the contents of section 6.3 of the HIV Cross-License Agreement).

agreement.  Most important, the wording over the signature block of Institut Pasteur that had previously said "For Approval" was changed to read "For Approval and as to Section 2.8," and the language was added to the preface of the Agreement stating "Institut Pasteur, a foundation organized under the laws of France ("Institut Pasteur"), joins in this Agreement for the purposes set forth herein."  JTX 45; 9/7/2004 A.M. Tr. at 73:3-73:23.

At the same time that the parties were negotiating the HIV Cross-License Agreement, discussions were moving forward on the HCV License Agreement and the Non-Assertion Agreement.  The arbitration clause in the HCV License Agreement was negotiated at the same time as the arbitration clause in the HIV Cross-License Agreement, and the two provisions are identical.  JTX 16, 44, 49.  The negotiations over the Non-Assertion Agreement, on the other hand, were principally among Institut Pasteur, Chiron and Ortho.  PTX 40, 44; Gerber Dep. at 141, 157-58.  Gallochat initially proposed a French forum for arbitration and French law.  PTX 48.  Chiron proposed in the alternative a neutral forum outside the United States or France.  PTX 48; 9/7/2004 A.M. Tr. at 88:11-89:15.  The parties ultimately agreed on French law in a Zurich forum for the Non-Assertion Agreement.  JTX 44; PTX 56, 57; 9/7/2004 A.M. Tr. at 88:11-89:15.

## III.    Events Following the Execution of the Agreements

The three agreements were signed in November 2003.  JTX 44, 45, 49.  The parties each point to events that took place after the signing of the agreements that they contend support their respective interpretations of the arbitration clause in the HIV Cross-License Agreement.

Institut Pasteur notes that shortly after the agreements were signed, Chiron issued a press release in which it described the HIV Cross-License Agreement as "among" Ortho, Chiron, PSD,

and GSC.  PTX 18.  Institut Pasteur points out that Chiron described the Agreement the same

way in a letter to Institut Pasteur dated May 25, 1994.  JTX 48, at 7309.  Finally, Institut Pasteur

notes that in 2001, Bio-Rad Laboratories (which succeeded to the interests of PSD and GSC)

executed an amendment to the HIV Cross-License Agreement with Ortho and Chiron.  Even

though the HIV Cross-License Agreement contains a provision stating that no "amendment under

this agreement shall be valid or effective unless in writing and signed by both parties hereto,"

JTX 45, § 9.7, Bio-Rad, Ortho, and Chiron all signed the amendment, but Institut Pasteur did not.

PTX 10; 9/7/2004 P.M. Tr. at 68:14-68:18.

Chiron highlights an exchange of correspondence among the parties that occurred shortly

before the commencement of this litigation.  In a March 20, 2003, letter to Institut Pasteur,

Chiron explained its view that sections 2.8 and 6.3 of the HIV Cross-License Agreement prevent

Institut Pasteur from appealing the Patent and Trademark Office's interference decisions to this

Court.  DTX 96.  Institut Pasteur responded in a letter from its outside counsel dated April 22,

2003:

> In Section 6.3, the parties, including both Pasteur *and* Chiron, agreed to
> "cooperate reasonably to resolve and withdraw from" certain pending patent
> interferences and oppositions.  Section 6.3 has nothing to do with Pasteur's right
> to participate in the review of a future interference proceeding.

DTX 97 (emphasis in original).  In a deposition, Nicole Rieunier-Burle -- now the general

counsel of Institut Pasteur, then a manager in the legal department of Elf Sanofi, and one of

Institut Pasteur's witnesses in the trial before this Court on arbitrability -- acknowledged that the

position taken in this letter was the product of discussions between herself and two other officials

at Institut Pasteur (Christian Policard and Danielle Berneman).  JTX 51 at 219:3-219:16.  Chiron

13

maintains that this letter demonstrates that even Institut Pasteur understood that it was a party to the HIV Cross-License Agreement, at least until that position became inconvenient upon Chiron invoking the arbitration clause in the contract.

## IV.    The Present Litigation

In September 1985, the Board of Patent Appeals and Interferences of the Patent and Trademark Office declared an "interference" to decide if scientists at Chiron or scientists at the National Institutes of Health ("NIH") and Centocor were the first to invent a certain immunodiagnostics test for HIV.  The Patent and Trademark Office ruled in favor of Chiron on the interference in October 2002.  NIH and Centocor did not appeal the ruling.  However, Institut Pasteur is a party to a settlement agreement with NIH that Institut Pasteur believes gives it a property right in the NIH and Centocor patent applications at issue in the interference.  DTX 96, at 3.  On April 23, 2004, Institut Pasteur appealed the Patent and Trademark Office decision to this Court pursuant to the interference review provisions of 35 U.S.C. § 146.

Chiron immediately moved to compel arbitration of the question whether the HIV Cross-License Agreement prohibits Institut Pasteur from bringing an action reviewing the interference decisions.[10]  Institut Pasteur responded that it is not bound to the arbitration clause of the HIV Cross-License Agreement at all, and therefore arbitration is inappropriate.  Following briefing from the parties, the Court concluded in a memorandum opinion and order dated March 28, 2004, that on the record as it then existed it was "not clear beyond dispute" that Institut Pasteur was bound to the arbitration provision in the HIV Cross-License Agreement.  Consistent with the

---

[10]  Chiron also filed a counter-claim seeking a broader ruling in its favor than provided by the Patent and Trademark Office decisions.

instruction of 9 U.S.C. § 4, the Court held that it would "proceed summarily to the trial" of whether there was an agreement to arbitrate.

Following discovery and briefing, on September 7 and 8, 2004, this Court held a bench trial on the issue of arbitrability.  Chiron offered as witnesses three individuals who were involved in the negotiations of the three agreements on behalf of Chiron and Ortho:  Peter Staple, Robert Blackburn (the manager of the intellectual property department at Chiron), and by deposition, William Gerber (the president of its diagnostics division).  9/7/2004 A.M. Tr. at 24:22-25:1, 36:19-36:20, 40:9-41:4, 9/7/2004 P.M. Tr. at 28:23-28:24; 31:24-32:3; Gerber Dep. at 8-9, 20.  Institut Pasteur presented three witnesses as well.  Two of these witnesses (Nicole Rieunier-Burle and Christian Policard), are presently executives at Institut Pasteur, but they were not working at Institut Pasteur at the time of the negotiations in 1993.[11]  9/7/2004 A.M. Tr. at 24:22-25:1.  The final witness, Danielle Berneman, was employed by Institut Pasteur as head of their patents and inventions division in 1993, but she was not involved in the negotiations of the agreements.  9/8/2004 A.M. Tr. at 31:21-32:1, 51:15-51:23.

Institut Pasteur had initially included Alain Gallochat on its witness list, and had advised Chiron that Gallochat would be available for a deposition.  On July 15, 2004, Institut Pasteur took the deposition of Blackburn, at which he testified regarding Gallochat's involvement in the negotiations on behalf of Institut Pasteur regarding the HIV Cross-License Agreement.  A day later, Institut Pasteur withdrew Gallochat as a witness.  See Def.'s Post-Trial Br., Ex. 15 (Kreeger

---

[11]  Policard is now the director of Institut Pasteur, but he was the chairman of PSD when the negotiations of the agreements at issue here occurred.  9/7/2004 P.M. Tr. at 88:11-88:20, 90:10-90:17.  Likewise, although Rieunier-Burle is now vice-president of legal affairs at Institut Pasteur, she was a manager in the legal department at Elf Sanofi during the relevant period. 9/8/2004 A.M. Tr. at 70:24-71:21.

Decl.).   Institut Pasteur did not provide Chiron an explanation for the withdrawal.  At the

hearing on the issue of arbitrability, Institut Pasteur explained to the Court that Gallochat lives in

France and therefore "wasn't interested in coming over here and testifying."  10/7/2004 Tr. at

70:19-70:20.

## ANALYSIS

A word should be said at the outset about the necessarily limited nature of the Court's

inquiry at this point in the proceedings.  Chiron relies on several of the provisions in the HIV

Cross-License Agreement -- among them sections 2.8 and 6.3 -- to argue that Institut Pasteur is

foreclosed from bringing this challenge to the Patent and Trademark Office's interference

decisions.  Chiron argues further that the interpretation of these provisions should itself be

resolved by an arbitration pursuant to section 9.10.2.  Institut Pasteur responds that it is not

bound to section 9.10.2 of the Agreement, and therefore the question of whether various sections

of the HIV Cross-License Agreement bar this action should be addressed by this Court rather

than an arbitrator.

The dilemma is that an analysis of whether Institut Pasteur is bound to the arbitration

clause inevitably draws this Court into an interpretation of other provisions in the Agreement,

such as sections 2.8 and 6.3, the proper interpretation of which -- if Chiron is correct -- is

committed to an arbitrator rather than this Court.  This is not an uncommon problem in the

interpretation of arbitration clauses, and the proper course is to proceed with caution, construing

no more of the agreement than is necessary to decide whether the case should be arbitrated.  See,

e.g., Republic of Nicaragua v. Standard Fruit Co., 937 F.2d 469, 477 (9th Cir. 1991) ("[C]ourts

must be careful not to overreach and decide the merits of an arbitrable claim.  Our role is strictly

limited to determining arbitrability and enforcing agreements to arbitrate, leaving the merits of the claim and any defenses to the arbitrator.").

Therefore, while the parties invite this Court on a free-ranging inquiry into the meaning of sections 2.8 and 6.3, the Court will look to those provisions at the present time only to the extent that an interpretation of those sections is essential to determining whether Institut Pasteur is a party to the arbitration clause in the Agreement.  See Great Western Mfg. Corp. v. Peacock, 110 F.3d 222, 230 (3d Cir. 1997) (holding that courts interpreting an arbitration clause should "decide only such issues as are essential to defining the nature of the forum in which a dispute will be decided").  As explained below, in light of the text of the Agreement and the history of the negotiations, both of which persuasively establish that Institut Pasteur is bound to the arbitration clause, a full interpretation of sections 2.8 and 6.3 must be left to the arbitrator in the first instance.

## I.     Legal Standard

The parties agree that New York law governs the question whether there is an agreement to arbitrate in the HIV Cross-License Agreement.[12]  Under New York law, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms."  W.W.W. Associates, Inc. v. Giancontieri, 77 N.Y.2d 157, 162 (1990). However, extrinsic or "parol evidence may be admitted to explain a writing when its terms are

---

[12]  See Def.'s Post-Tr. Br. at 6; Pl.'s Pre-Trial Br. at 4.  Institut Pasteur cites section 9.9 of the HIV Cross-License Agreement, which states that "[t]his agreement is subject to and shall be construed and enforced in accordance with the laws of the state of New York," for the application of New York law to this case, JTX 45; Pl's Pre-Trial Br. at 4, although Institut Pasteur never explains how its concession that section 9.9 (choice of law) governs this action can be squared with its contention that section 9.10.2 (arbitration) does not.

ambiguous." Care Travel Co., Ltd. v. Pan American World Airways, Inc., 944 F.2d 983, 988 (2d

Cir. 1991); see Investors Ins. Co. of America v. Dorinco Reinsurance Co., 917 F.2d 100, 104 (2d

Cir. 1990); Health-Chem Corp. v. Baker, 737 F. Supp. 770, 773 (S.D.N.Y. 1990).

As the party alleging an agreement to arbitrate, Chiron bears the burden of proving the

existence of such an agreement. See Samsun Corp. v. Khozestan Mashine Kar Co., 926 F. Supp.

436, 439 (S.D.N.Y. 1996). It must be emphasized that this does not mean that Chiron must

prove that Institut Pasteur specifically agreed to the inclusion of the arbitration provision in the

agreement. Instead, "[u]nder New York law, a party who signs a written contract is conclusively

presumed to know its contents and to assent to them." Progressive Cas. Ins. Co. v. C.A.

Reaseguradora Nacional de Venezuela, 991 F.2d 42, 46 (2d Cir. 1993); see Metzger v. Aetna Ins.

Co., 227 N.Y. 411, 416 (1920). Therefore, Chiron need only show that Institut Pasteur signed

the HIV Cross-License Agreement (which is clear), and that the act of signing the Agreement

bound it to the arbitration provision in section 9.10.2 (which is somewhat less so).[13]

Chiron argues that the federal presumption in favor of the arbitrability of an agreement

should guide the Court's inquiry. However, "this federal policy favoring arbitration does not

apply to the determination of whether there is a valid agreement to arbitrate between the parties;

---

[13] The language quoted in the text from Progressive Cas. Ins. does not mean, as Chiron seems to suggest, that a party is conclusively bound to every provision in an agreement merely by signing it. The difference between a party *assenting* to every provision in the provision and being *bound* to every such provision is illustrated by a contract with a provision that expressly states that only a subset of the parties are bound to the provision. This is not to say that the HIV Cross-License Agreement contains such language. Rather, it is to recognize that Progressive Cas. Ins. holds no more than that in the absence of fraud, a party is assumed to know and consent to the text of an agreement when it signs the agreement, Progressive Cas. Ins., 991 F.2d at 46; Maye v. Smith Barney Inc., 897 F. Supp. 100, 108 (S.D.N.Y. 1995), not that a party is bound to every provision in the agreement even if the text states otherwise.

instead ordinary contract principles determine who is bound." <u>Fleetwood Enters. Inc. v.</u>

<u>Gaskamp</u>, 280 F.3d 1069, 1073 (5th Cir. 2002) (quotation omitted); <u>accord</u> <u>McCarthy v. Azure</u>,

22 F.3d 351, 355 (1st Cir. 1994).  Therefore, this Court examines whether Institut Pasteur is

bound to the arbitration provision in the agreement without the aid of a presumption, looking

first to the text of the agreement and then to parol evidence to resolve any ambiguities.[14]

## II.      Text of the HIV Cross-License Agreement

The textual evidence supporting an interpretation of the arbitration clause in section

9.10.2 of the HIV Cross-License Agreement that extends  it to Institut Pasteur is compelling.

First, Institut Pasteur is a signatory to the contract.  Second, the signature rests underneath

language on the final page of the contract stating "the parties have duly exercised this Agreement

on the date(s) written below."  JTX 45, at 22.  <u>Cf.</u> <u>Medical & Health Employees v. Klein</u>, 218

A.D.2d 788, 789 (2d Dep't 1995) ("As signatories to the agreement, all of the parties . . . are

bound by the mandatory arbitration clause contained in the agreement.").  Third, the arbitration

provision in section 9.10.2 is broadly worded and contains no limitation on the parties to which it

applies.  <u>See</u> <u>Oldroyd v. Elmira Savings Bank, FSB</u>, 134 F.3d 72, 76 (2d Cir. 1998) ("[T]he

existence of a broad agreement to arbitrate creates a presumption of arbitrability . . . ."); <u>Digene</u>

<u>Corp. v. Ventana Med. Sys., Inc.</u>, 316 F. Supp. 2d 174, 184 (D. Del. 2004) ("Because the CLA's

arbitration clause is broadly worded -- it refers only to 'the parties '-- it applies to all parties to the

---

[14]  Although there is a countervailing presumption in New York state law *against* the
arbitrability of contracts, <u>Marlene Indus. Corp. v. Carnac Textiles, Inc.</u>, 45 N.Y.2d 327, __
(1978), that  presumption also does not apply here, because it is undisputed that the underlying
contract involves interstate commerce and state law governing arbitrability is therefore
preempted by the Federal Arbitration Act, <u>Progressive Cas. Ins. Co.</u>, 991 F.2d at 46; <u>I.K. Bery,</u>
<u>Inc. v. Boody</u>, 2000 WL 218398, at *4 (S.D.N.Y.); Mar. 29, 2004, Op. at 4.

CLA.").

Fourth, the agreement gives rise to clear rights and obligations on the part of Institut

Pasteur.  Among other provisions in the agreement, these rights and obligations can be found in

sections 2.8.1 and 2.8.2, which create a sub-licensing scheme between Institut Pasteur on the one

hand, and Ortho and Chiron on the other; in section 2.8.3, where Institut Pasteur expressly

"agree[s] not to assert (or assist others in asserting) against the Ortho/Chiron Parties" certain

patent rights relating to HIV; and in section 9.15, which states that "Institut Pasteur, by exercising

this Agreement, hereby signifies its consent to the terms hereof, agrees to the provisions of

Section 2.8, and agrees to take no action which would have the effect of frustrating this

Agreement."  JTX 45 (emphasis added).  There is simply no reason to believe that Institut

Pasteur agreed to bind itself to sections 2.8.1, 2.8.2 and 9.15 but not to section 9.10.2.

Fifth, every other agreement in the record signed by Institut Pasteur also contains an

arbitration provision.  See, e.g., JTX 2 § 15.5 (cooperation agreement between Institut Pasteur

and PSD); JTX 44 § 6.2 (non-assertion agreement); JTX 49 § 13.10 (HCV license agreement).

These provisions vary in many respects, but one constant is that they each require resolution of

any disputes by an arbitrator rather than a court.  In light of these provisions, it is somewhat

difficult to believe that Institut Pasteur would opt out of the arbitration provision in the HIV

Cross-License Agreement for any disputes relating to its obligations under sections 2.8.1, 2.8.2,

and 9.15, without some statement explaining specifically that it is doing so (or some parol

evidence on that score as well).

As the case has progressed, the position of Institut Pasteur regarding its status under the

HIV Cross-License Agreement has become increasingly strained.  Prior to the trial in this matter,

Institut Pasteur alternated between arguing that "it was not a party to the Agreement" at all, and suggesting that it was a party only as to section 2.8.  Pl.'s Pre-Trial Br. at 2; see id. at 4 (Institut Pasteur is "bound only by Section 2.8 of the Agreement").  In its post-trial papers, Institut Pasteur seems to have settled on the position that it is "not a . . . party" to the agreement, but that it "joined in" section 2.8 as a non-party.  Pl.'s Post-Trial Br. at 2.

This is an awkward position for Institut Pasteur.  There is no authority for the notion that an individual or company can "join in" a contract -- at least in the sense of assuming obligations directly under the contract -- in some capacity other than as a party.  Even if there were such authority, the very text of the Agreement forecloses any reliance in this case on this novel form of participation in a contract.  Section 9.6 of the HIV Cross-License Agreement states that "[n]othing herein contained will be deemed to create any third party beneficiaries or confer any benefit or rights on or to any person not a party hereto, and no person not a party hereto shall be entitled to enforce any provisions hereof or exercise any rights hereunder."  JTX 45, § 9.6.  Once Institut Pasteur acknowledges -- as it must -- that it assumes obligations under section 2.8 of the Agreement, section 9.6 precludes any argument that it is anything other than a party to the Agreement.

Nonetheless, Institut Pasteur maintains that its position finds support in the language above its signature block stating "For Approval and as to Section 2.8."  Institut Pasteur argues that this language should be read to confine its participation in the Agreement to approving the sub-license from PSD, and taking on obligations under section 2.8 but no other provision.  Reading this language to confine Institut Pasteur's obligations under the Agreement to section 2.8 encounters several problems, among them that it loses all force the moment it becomes clear that

Institut Pasteur is bound to provisions beyond section 2.8.  As indicated earlier, it is clear that section 9.15 is such a provision.  That section states that Institut Pasteur "agrees to take no action which would have the effect of frustrating this Agreement."  The plain text of this provision creates an obligation on the part of Institut Pasteur.

Institut Pasteur is unable to offer any real response to this point.  At trial, Institut Pasteur's own witnesses described section 9.15 as creating on behalf of Institut Pasteur a "commitment to act," and Institut Pasteur was forced to acknowledge at closing argument that it is "arguably" bound to section 9.15.  9/18/2004 A.M. Tr. at 30:15-30:21.  In its papers, Institut Pasteur argues that the provision was designed to protect PSD rather than Chiron and Ortho, but this is no answer at all to the question of whether it binds Institut Pasteur.  Pl.'s Post-Trial Br. at 13.  Plainly, section 9.15 does give rise to obligations by Institut Pasteur, and this fact alone negates much of the force of the argument that the language above the signature block indicates that Institut Pasteur has obligations under section 2.8 and nothing more.

Institut Pasteur's reliance on this language runs into other problems as well.  As indicated earlier, Institut Pasteur is unable to provide a persuasive explanation for the choice of law and arbitration rules that it understood would apply to any dispute arising out of section 2.8 in the absence of section 9.10.2.[15]  Along the same lines, it is not particularly credible that Institut

_____

[15]  Institut Pasteur has suggested that this problem can be disregarded because Chiron and Ortho have exercised their options under the Agreement and section 2.8 is therefore "moot." 9/8/2004 P.M. Tr. at 33:2-33:6, 46:25-47:24.  This argument is incorrect:  The licensing and royalty obligations under sections 2.8.1 and 2.8.2 continue, and the non-assertion obligations in section 2.8.3 do as well.  At any rate, the critical question here is what the parties intended at the time the agreement was signed, and at that point Institut Pasteur had undeniably assumed obligations under section 2.8.  See, e.g., Evans v. Famous Music Corp., 807 N.E.2d 869, 872 (N.Y. 2004) ("It is well settled that our role in interpreting a contract is to ascertain the intention of the parties at the time they entered into the contract.").

Pasteur would sign an agreement in which it licenses patents without any of the legal protections provided by the general enabling provisions, including the sections governing termination and breach (section 7), the confidentiality of information (section 8), providing force majeure protection (section 9.3), and prohibiting the assignment of the Agreement (section 9.5).

Institut Pasteur's theory would read all of these provisions out of the contract as well. There is no principled basis for distinguishing these provisions from the choice of law provisions in section 9.9 and the arbitration provisions in section 9.10.2. The omission of any limitations on the assignment and sub-license of its licenses is particularly glaring in light of the testimony at trial that Institut Pasteur is extremely concerned about who is allowed to use its intellectual property, and that it went so far as to negotiate a provision in its licensing agreement with PSD that gives it an absolute veto over any sub-license. JTX 1; 9/8/2004 A.M. Tr at 7:4-7:14 (discussing the inclusion of a provision in Institut Pasteur's licensing agreement with PSD that gives it an absolute veto over any sub-license).

Institut Pasteur sometimes shifts weight away from the "as to section 2.8" language and to the "for approval" language in the signature block, arguing that the mere signing of an agreement "for approval" does not make one a party to the contract or to its arbitration provision (and that the addition of section 2.8 relatively late in the negotiations should not alter Institut Pasteur's obligations with regard to section 9.10.2). Even in the absence of case law on point, this Court would entertain serious doubts (1) that the addition of "for approval" language above a signature block can negate those sections of an agreement where a party clearly assumes obligations (i.e., section 9.15); (2) that the enabling provisions of the agreement would not apply in any event to disputes relating to the approval of the Agreement; and (3) that the addition of section 2.8 is an

irrelevant event in this regard.

However, there is recent authority rejecting the very argument advanced by Institut Pasteur here, in a case actually involving a patent license agreement signed by Institut Pasteur.  In Digene Corp v. Ventana Med. Systems, Institut Pasteur and Life Technologies, Inc. (LTI) had entered into a cross-license agreement ("CLA") that was signed by Beckman Coulter, Inc. ("Beckman") under the word "accepted."  316 F. Supp. 2d 174, 178 (D. Del. 2004).  Beckman was not mentioned in the introduction to the agreement, and the agreement did not bind or obligate Beckman in any way.  Id. at 178-80.  In fact, the court found that "Beckman's main interest in the [agreement] was that LTI's intellectual property rights . . . were being licensed to [Institut Pasteur in the CLA] so that [Institut Pasteur] could then sublicense those rights to Beckman."  Id. at 179.

Applying New York law, the court nonetheless concluded that Beckman was a party to the agreement, and that it accordingly enjoyed the right to enforce the arbitration provisions in the cross-license agreement against Digene Corp. (a successor-in-interest to LTI that had brought a patent infringement claim against Beckman).  Id. at 183-84.  The court relied on Beckman's signing of the agreement "accepted," and language in the agreement stating that Beckman "accept[s] the terms and conditions of the present Agreement by signing hereunder."  Id. at 178, 183.  The court also emphasized that Digene had made a judicial admission earlier in the case that Beckman was bound by the terms and conditions of the CLA.  Noting that a "signatory may be bound by, and thus a party to, a contract, even though the signatory is not named as a party in the body of the contract," the court concluded that the circumstances of the case established Beckman as a party to the contract.  Id. at 184.

24

The reasons for treating Institut Pasteur as a party here are at least as strong as those in Digene. The language in section 9.15 of the HIV Cross-License Agreement is practically identical to the "accept[s] the terms and conditions of the present Agreement" language on which the Court so heavily relied in Digene.[16]  Unlike in Digene, the HIV Cross-License Agreement here clearly gives rise to obligations on the part of Institut Pasteur.  Finally, while there is not quite a judicial admission here, there is the next closest thing:  a letter sent by Institut Pasteur the day before it filed this action, created by its officers and transmitted by its counsel, in which Institut Pasteur acknowledges that it is a party to the Agreement.  See DTX 97.  This Court finds no reason to depart from the holding in Digene that a signatory is bound to the arbitration clause in a license agreement even if the words "accepted" or "for approval" appear above its signature line.[17]

Accordingly, both the text of the agreement and the case law arising out of similar circumstances provide strong support for the conclusion that Institut Pasteur is a party to the agreement and is bound to the arbitration clause in section 9.10.2.[18]  As this Court observed in its

---

[16]  Certainly Digene cannot be distinguished on the ground that it was signed "accepted" rather than "for approval":  the Digene court itself noted that the parties understood in the negotiations that Beckman would sign the agreement "for approval." Id. at 179.

[17]  Institut Pasteur's only response to Digene is to note that it involved a non-royalty bearing license.  See Pl.'s Supp. Mem. at 1.  That does not amount to a distinction of any relevance, however, in view of the numerous obligations that are contained even in a non-royalty bearing license and the absence of any evidence that Institut Pasteur had a policy on demanding arbitration provisions that distinguished in some way between royalty-bearing and non-royalty-bearing licenses.

[18]  Institut Pasteur cites Ark Bryant Corp. v. Bryant Park Restoration, 730 N.Y.S. 2d 48, 55 (1st Dep't 2001), a case in which a city licensed its park catering rights to the defendant, which in turn sublicensed them to the plaintiff in a letter signed by the city under the heading "approval."  The court declined to find an agreement between the city and the plaintiff by virtue

initial order, the fact that Institut Pasteur is a *party* to the agreement does not mean that it

assumes obligations under *every provision* of the Agreement.  In fact, the duties of Institut

Pasteur under the Agreement are narrow.  Indeed, it appears that Institut Pasteur is not involved

at all in most of the first several sections of the Agreement (excluding section 2.8).  However,

that fact in and of itself does not imply that Institut Pasteur is excluded from the enabling

provisions of the agreement generally, or the arbitration clause in particular.  More specifically,

there is no indication in the arbitration provision, or anywhere else in the HIV Cross-License

Agreement,[19] that the parties intended to exclude Institut Pasteur from the broad and

---

of the signature of the city.  The court did not cite any law for this proposition, and in reaching its decision, the court emphasized that the sub-license did not impose any obligations on the city, that the sub-license impermissibly exceeded the scope of the original license, and that the city was "acting as a public body giving its approval."  Id. at 54-56.  All of these facts distinguish Ark Bryant from this case and from Digene.

[19]  The parties devoted some attention at trial to the question whether Institut Pasteur is bound specifically to section 6.3 of the Agreement as well.  Chiron argued for an interpretation of the provision that confines the opposition language in the first sentence to immunodiagnostics, and notes that interferences are only among patent owners and therefore Institut Pasteur must be a party to the provision, since it is the only owner of relevant patents from the Pasteur side of the agreement.  Institut Pasteur responds that Chiron declined to withdraw a pending opposition against Institut Pasteur that at least partly extended to immunodiagnostics, and that the interference language in section 6.3 meant to include patents owned by GSC and PSD as well (both of whom own patents).

This debate is waged in detail by the parties but is incidental to the question of whether Institut Pasteur is bound to section 9.10.2.  Section 9.15 undeniably contains obligations on the part of Institut Pasteur (in addition to section 2.8), and so it is not essential to this decision that section 6.3 be found to contain such obligations as well.  On the other hand, section 6.3 is at the heart of the dispute over whether the HIV Cross-License Agreement forecloses this appeal of the Patent and Trademark Office decisions.  Under this Memorandum Opinion, the interpretation of section 6.3 is covered by the arbitration clause in the Agreement.  It is therefore precisely the sort of issue, not essential to the question of arbitrability, that should be decided by an arbitrator rather than the Court in the first instance.  See supra at 16-17; Great Western, 110 F.3d at 230; Republic of Nicaragua, 937 F.2d at 477.

unconditional arbitration requirement in section 9.10.2.[20]

Institut Pasteur maintains that an interpretation of the Agreement under which it bears

obligations beyond section 2.8 makes meaningless the language above its signature block.  But

under Institut Pasteur's theory, the language in section 9.15 in which Institut Pasteur assumes a

clear burden is meaningless as well.  Under either interpretation of the contract, at least one

provision is rendered precatory.  This is precisely the ambiguity in the Agreement that led the

Court in its first opinion to conclude that it was not "clear beyond genuine dispute" from the

record then before it that there was an agreement to arbitrate, and hence to hold a trial on the

issue of such an agreement.  Having carefully considered the evidence and testimony presented at

trial, the Court concludes that the negotiations behind the agreements confirm what the text of

the HIV Cross-License Agreement suggests:  that Institut Pasteur is bound to the arbitration

provisions in section 10.2.

## III.    Parol Evidence

Perhaps the most persuasive evidence revealed at trial are the documents demonstrating

that Institut Pasteur and its general counsel Alain Gallochat were involved in the negotiation of

the HIV Cross-License Agreement and specifically the arbitration clause in that Agreement.  A

letter sent from Nicole Rieunier-Burle of PSD to Institut Pasteur contains at least three separate

---

[20]   Institut Pasteur highlights language in section 9.10.1 stating that the parties "may" have such disputes referred to their respective officers, listing respective officers for Chiron, Ortho, GSC and PSD, and then stating that if the officers are unable to resolve the dispute within 30 days, they "may" invoke the alternative dispute resolution provisions in section 9.10.2.  It is apparent, however, that the use of 9.10.1 is a voluntary procedure, and a party is free to proceed directly to the mandatory 9.10.2 process if it wishes.  The Court does not read the failure to list an officer for Institut Pasteur in section 9.10.1 as reflecting any intent to exclude Institut Pasteur uniquely from the broad arbitration provisions in section 9.10.2.

indications that Gallochat was providing comments through PSD on the HIV Cross-License Agreement.  See JTX 12, at 4664 ("9.8  Because of IP, French law should apply."); id. ("6.3  This paragraph will need some adjustments because of IP"); id. at 4662 (definition "provided by Alain Gallochat").  One of the edits proposes specific changes to the arbitration clause "[b]ecause of IP."  JTX 12.  Chiron's witnesses testified persuasively that they were told by negotiators at PSD that they were providing drafts of the agreement to Institut Pasteur.  See  9/7/2004 A.M. Tr. at 56:1-56:5 ("Susan and Nicole indicated they would provide copies to the other interested parties.").

Although Rieunier-Burle insisted at trial that she did not consult with Institut Pasteur during the negotiations, but instead assumed that Institut Pasteur would want the changes reflected in the letter, this testimony is unhelpful to Institut Pasteur.  9/8/2004 P.M. Tr. at 31:9-31:15.  First, the testimony is inconclusive, because Chiron's witnesses testified that Susan Larabee at PSD, and not just Nicole Rieunier-Burle, told them that they were consulting with Institut Pasteur.  See, e.g., 9/7/2004 A.M. Tr. at 83:6-83:7 ("[Susan Larabee] told us that they would take care of sending the term sheets to Institut Pasteur.").  Moreover, the testimony is severely undercut by notes showing that PSD in fact consulted with Institut Pasteur on the arbitration and choice of law clauses of the HIV Cross-License Agreement.  See DTX 51 ("HIV . . . .  Choice of law/arbitration: PSD w/ discuss c: IP & respond by Thursday 9 Sept.").  This powerful evidence went unrefuted at trial, and Rieunier-Burle's testimony simply is not persuasive in light of these notes, as well as the letter itself and the other evidence suggesting that Institut Pasteur was being consulted during the HIV Cross-License negotiations.

However, even if Rieunier-Burle's explanation were credible, it does not bear on the

precise issue before the Court.  The essential question is not really whether executives from Institut Pasteur played a role in the negotiations, but whether the individuals who did participate in the negotiations on the Pasteur side believed that edits were necessary to the arbitration clause because of Institut Pasteur.  On this point, it is undisputed that PSD believed that edits were necessary due to the involvement of Institut Pasteur.  The only plausible reason the Court heard at trial for why edits would be necessary on behalf of Institut Pasteur is if the negotiating party believed that Institut Pasteur might one day find itself before an arbitrator regarding a dispute over the agreement.  Therefore, even if it were true that PSD was not consulting Institut Pasteur but instead was speaking on its behalf, the fact that PSD found it necessary to speak on Institut Pasteur's behalf at all with regard to the arbitration provision is evidence that the parties at the time understood that Institut Pasteur would be bound to the provision.

It is telling in this regard that although Chiron came forward with strong testimonial evidence of its knowledge and intent in negotiating the contract, Institut Pasteur did not offer the testimony of anyone who was at Institut Pasteur and participated in the negotiations of the agreements.  In fact, it appears that Institut Pasteur withheld the testimony of Alain Gallochat, the general counsel at the time for Institut Pasteur and the individual who could have spoken directly to Institut Pasteur's understanding of the negotiations  and responded directly to some of the documentary evidence suggesting its involvement in the various agreements.  Institut Pasteur initially offered Gallochat as a witness and scheduled his deposition, but then retracted him a day after one of the other depositions in the case.  Institut Pasteur could not offer a satisfactory

explanation for this retraction.[21]

Rather than offer testimony bearing directly on its intent in the negotiations, Institut Pasteur chose to rely on three inferences that it believes can be drawn from the documentary record at trial. First, Institut Pasteur argues that it has a "policy" of insisting on the application of French law and arbitration in the International Court of Arbitration, and that it would not have signed an agreement that contains an arbitration provision specifying application of New York law. Pl.'s Pre-Trial Br. at 17; Post-Trial Br. at 16. At the outset, Institut Pasteur has not provided any evidence of such a "policy." It did not offer any witnesses who were at Institut Pasteur during the period and could speak to such a policy, even the witnesses presented did not describe any such policy, and it did not cite any documents in the record that supported such a policy. More to the point, the contention that such a policy existed is clearly discredited by Digene Corp.

––––––––––––––––––––––––

[21] The D.C. Circuit has recognized that "if a person having important evidence and peculiarly within the power of one of the parties to produce is not called, the factfinder may draw an inference that 'the missing witness would have given testimony damaging to that party.'" Bufco Corp. v. N.L.R.B., 147 F.3d 964, 971 (D.C. Cir. 1998) (quoting United States v. Pitts, 918 F.2d 197, 199 (D.C. Cir. 1990)).

Institut Pasteur argues that this inference is inapposite here, because Chiron could have called Gallochat itself, and Gallochat was outside the subpoena power of this Court. However, Institut Pasteur specifically told Chiron that contact with Gallochat "should be made through plaintiff's counsel only," casting some doubt on its present suggestion that he was, in fact, available to Chiron the entire time. Def.'s Post-Trial Br., Ex. 15, at Ex. B (Pl.'s Second Am. Disclosures). Further, courts have indicated that "a witness can be peculiarly available when physically available to only one of the parties, for example, to a defendant, *but beyond the subpoena power* of the government." Carr v. United States, 531 A.2d 1010, 1012-13 (D.C. 1987) (emphasis added).

At any rate, this Court need not infer that Gallochat would have provided unfavorable testimony to Institut Pasteur. It is sufficient to note that Institut Pasteur was unable to provide any compelling insight into its intent at the time of the relevant events because none of the witnesses it offered could speak directly to that crucial issue.

v. Ventana Med. Sys., a case that describes a cross-license agreement signed in late 1990 (only three years before the HIV Cross-License Agreement) to which Institut Pasteur was a party and that contains an arbitration provision specifying New York law and an arbitration conducted in New York City.  See Digene, 316 F. Supp. 2d at 178.

Institut Pasteur's argument also proves entirely too much.  If Institut Pasteur truly insisted on a license agreement with arbitration in a tribunal of the ICC applying French law, then it is unlikely that it would sign an agreement that was governed by *no arbitration or choice of law provision at all*, which is the outcome of the suggested interpretation of the HIV Cross-License Agreement.  Institut Pasteur's reading of the Agreement as binding it only to section 2.8 and no further would leave it with no agreement to arbitrate any dispute over the license in section 2.8, and no specified choice of law provision.  The determination of the substantive law to apply to the case would be left to the uncertainty of a forum court applying choice of law principles to an agreement with parties incorporated in locations as diverse as Delaware, New Jersey and France. JTX 45, at 1.

Institut Pasteur insists next that a comparison of the negotiating history of the three agreements in the case reveals that when it was a party to an agreement, it took an active role in negotiations and demanded French alternative dispute resolution and choice of law provisions. Therefore, it argues, it could not have been a party to the HIV Cross-License Agreement, for which it was not involved in the negotiations at all, and which contains a New York arbitration clause.  However, this account misreads the evidence in the record, which persuasively shows that Institut Pasteur was involved in the negotiation of each contract to varying degrees, and although it always requested a French arbitral forum and French law, the final clause in each

31

agreement was the product of negotiation.  As Institut Pasteur took on greater rights and responsibilities in an agreement, it took a more prominent role in the negotiations, and more aggressively demanded an arbitration provision to its liking.

For example, even before section 2.8 was added late in the negotiations of the HIV Cross-License Agreement, a French arbitration clause was proposed on behalf of Institut Pasteur. Chiron and Ortho rejected that proposal, and the parties ultimately agreed on a compromise that denied Chiron and Ortho their desired forum of New Jersey and imposed limitations on what Institut Pasteur appeared to view as some of the excesses of United States arbitration.  JTX 14, 16, 45; supra at 10-11.  By contrast, Institut Pasteur assumed greater obligations in the Non-Assertion Agreement, and it took on a more direct role in the negotiations.  This time, when Institut Pasteur again demanded a French arbitration provision and Ortho and Chiron disagreed, the parties this time negotiated a neutral forum in Zurich.  Supra at 12.  The fact that Institut Pasteur demanded French law and a French forum in each of the agreements, and negotiated a compromise position each time that was more to its liking the greater the obligations its assumed in the agreement, is conduct fully consistent with -- and indeed, supports  -- the conclusion that it was a party to each of the agreements.

Finally, Institut Pasteur highlights the press release that followed the signing of the agreements and the subsequent amendment to the HIV Cross-License Agreement, both of which omit mention of Institut Pasteur as a party to the Agreement.  However, Chiron credibly explained that the press release is not intended to be comprehensive, but instead to highlight those parts of the Agreement that are "significant business terms" relevant to investors.  Gerber Dep. at 261:21-262:6.  Further, the amendment several years later pertained specifically to the

cross-license between Ortho and Chiron on the one hand and PSD and GSC on the other, and

thus the Court does not place much weight on the failure of the parties to understand that Institut

Pasteur was also a party (to other provisions in the Agreement) and obtain its signature.

Along with the language above the signature block, this course of performance evidence

was ultimately the strongest proof that Institut Pasteur could provide to support its contention

that it is not bound to the arbitration clause.  However, this proof simply cannot overcome the

much stronger textual and parol evidence demonstrating that Institut Pasteur assumed clear

obligations under the HIV Cross-License Agreement, that it was a participant in the negotiations

of that Agreement generally and the arbitration and choice of law provisions in the Agreement in

particular, and that the parties did not intend to exclude Institut Pasteur from the broad arbitration

clause the parties agreed to in section 9.10.2 of the Agreement.[22]

## CONCLUSION

The Court accordingly enters judgment in favor of Chiron on the issue of whether Institut

---

[22] Institut Pasteur has argued that even if it is bound to the arbitration clause, Chiron cannot enforce the arbitration clause because it entered the Agreement only in its capacity as a joint venture with Ortho, and therefore the consent of Ortho is necessary to take any action under the Agreement.  Pl.'s Pre-Trial Br. at 4.  However, Institut Pasteur has failed to carry its burden of proving the existence of a joint venture.  See Allen Chase & Co v. White, Weld & Co., 311 F. Supp. 1253, 1259 (S.D.N.Y. 1970).

Although the Agreement states that Ortho and Chiron are "entering into this Agreement as part of their joint business," the parties signed the agreement separately, they are listed separately in the introduction, and there is no indication in the agreement that Ortho and Chiron are barred from enforcing the Agreement independent of one another.  JTX 45 § 9.14.  In addition, the agreement between Ortho and Chiron giving rise to their relationship explicitly states that they are independent contractors, and that it is not to be construed so as to constitute them as "partners or joint venturers."  DTX 104, at 64-65.  Perhaps for these reasons, Institut Pasteur seems to have backed away from its joint venture argument in its post-trial papers.  See Pl.'s Post-Trial Br. at 2-3.

Pasteur is bound to the arbitration clause in the HIV Cross-License Agreement.  A separate order

will issue herewith.

     /s/ John D. Bates     
JOHN D. BATES
United States District Judge

Signed this <u>16th</u> day of February, 2005.

Copies to:

Edward T. Colbert
Albert J. Breneisen
Christopher Lee Ogden
Richard Stephen Gresalfi
KENYON & KENYON
1500 K Street, N.W.
Suite 700
Washington, DC 20005
(202) 220-4200
Fax: (202) 220-4201
Email: ecolbert@kenyon.com
    *Counsel for plaintiff*

Matthew I. Kreeger
Rachael Krevans
Stephen Michael Colangelo
Will B. Fitton
MORRISON & FOERSTER, LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7178
Fax: (415) 268 7522
Email: mkreeger@mofo.com
    *Counsel for defendant*